[Cite as *State v. Graggs*, 2019-Ohio-4694.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No.19AP-173 |
| v. | : | (C.P.C. No. 08CR-1098) |
| John Q. Graggs, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 14, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee.

**On brief:** *John Q. Graggs*, pro se.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, John Q. Graggs, appeals the judgment entered by the Franklin County Court of Common Pleas on March 8, 2019, denying his second petition for postconviction relief. Because the trial court made findings that were in direct contradiction of our previous decision in this litigation, we disagree with parts of the judgment, finding error in the trial court's conclusions that Graggs' evidence, even if believed, would not be exculpatory and that Graggs had not shown that he was unavoidably prevented from discovering the new evidence at issue. We also note that the trial court erred in ignoring a claim by Graggs that his imprisonment is unlawful because he is innocent but find that this error was harmless because such a claim should have been asserted via a motion for a new trial, rather than in a postconviction petition. Thus, we ultimately affirm the judgment of the trial court on the narrow ground that Graggs did not demonstrate ineffective assistance of counsel inasmuch as he did not show that the

evidence he now offers could have been (but without good reason was not) used by his counsel in the original case.

{¶ 2} Despite disagreeing with much of the trial court's reasoning, we affirm the judgment of the trial court on the narrow basis as stated.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 3} On February 15, 2008, Graggs was indicted for aggravated robbery, kidnapping, murder, and two counts of aggravated murder, all counts with firearm specifications.  (Feb. 15, 2008 Indictment.)  We previously explained the facts underlying these charges as follows:

> The charges in this case arise out of the shooting death of Fred Brock, also known as "Food Stamp Freddie" ("Brock") that occurred on January 8, 2008. The following description of events surrounding Brock's death were adduced at trial.
>
> Marcus Jones ("Marcus") had been living at 3566 East Main Street, Apartment B-11, for about three months prior to Brock's death. According to Marcus, he and his friend Jessie Lanier ("Lanier") sold cocaine out of this apartment. Marcus testified they sold bricks of cocaine for $ 28,000 a piece. Brock was a friend of Lanier's that met Marcus about three days prior to the shooting. Essentially, Brock was hired to "stay in the house and pretty much make sure no one came in the house and took the money and the drugs." (Tr. 351.)
>
> On January 8, 2008, Marcus picked up his cousin, Dominic Jones ("Dominic"), and they went to a local high school basketball game. When Marcus left, Brock was on the couch watching television and Lanier was in the bathroom. While at the basketball game, Marcus saw Lanier arrive at the game alone. After the game, Marcus and Dominic went to the home of Marcus's father, Marvin Jones ("Marvin"), and began watching a movie. After being at Marvin's for approximately 15 minutes, Marcus got a telephone call from Lanier telling Marcus to come to the apartment. When Marcus and Dominic arrived at the apartment, Lanier was not there, but Lanier and a girl arrived about two minutes later. The three men entered the apartment where Brock was lying face down on the floor, handcuffed and shot.
>
> Marcus testified he never touched the body, but he was scared and he, Dominic, and Lanier began to clear the apartment of drug paraphernalia and things related to the drug operation, including scales and $ 17,000 in cash. After taking several loads

of items to Lanier's vehicle, Lanier left the complex. Marcus and Dominic then left the apartment and went to the Barnett Recreation Center where they called Marvin. According to Marvin, about 15 minutes had passed from when Marcus and Dominic left his house and made the call. Marvin told Marcus to call the police, and the three men proceeded to the apartment complex. Marvin went into the apartment with Dominic while Marcus called 911 from the hallway.

Just as the dispatch was ending, Whitehall Police Officer Eric Hollyfield pulled into the parking lot of the apartment complex and observed a man waving "frantically" to him. (Tr. 35.) As Officer Hollyfield entered the building, two other men directed him to Apartment B-11. Upon entering the apartment, Officer Hollyfield observed the victim lying face down on the floor. There was blood on the victim's back, and his hands were handcuffed behind his back. After clearing the room, Officer Hollyfield checked for a pulse and called for medics. According to Officer Hollyfield, the entire apartment appeared to be in disarray and "methodically ransacked," as dresser drawers were pulled out and cushions were flipped. (Tr. 73.)

Marcus testified that though the apartment had been neat when he left, "everything was just thrown around" when he returned from the basketball game. (Tr. 378.) Marcus also discovered that $ 35,000 in cash and Lanier's revolver were missing from the apartment. Though Marcus testified he initially lied to the police because he feared facing drug charges, he later told them the "whole truth" after he was arrested. (Tr. 388.) Marcus denied touching or shooting a gun on January 8, 2008; however, a gun shot residue test conducted at 10:33 p.m. that day revealed particles "highly indicative" of gunshot powder residue. Marcus denied knowing or ever meeting [Graggs].

According to the testimony of the medical examiner, Brock had been shot three times, twice to the back and once to the head. Heather Ann Williams, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified that the bullet recovered from Brock's thorax and the bullet recovered from the floor were fired from the same gun, but the bullet recovered from Brock's head was fired from a different gun.

During evidence collection at the scene, the tip of a green latex glove was found under Brock's body. The glove was found to contain the DNA of [Graggs]. A search of [Graggs]' residence revealed a revolver and a green latex glove. The gun was

determined not to be one that fired any of the bullets recovered from the scene, but the glove tip from the scene was determined to be similar to the glove found at [Graggs]' residence.

On January 9, 2008, at approximately 1:25 p.m., [Graggs] paid cash for a pair of diamond earrings at Jared's jewelry store in the total amount of $ 480.35. At 8:19 p.m. that day, [Graggs] returned to Jared's and paid $ 4,771.69 in cash for an anniversary ring. On January 14, 2008, [Graggs] also made a lump-sum payment of $ 2,900 on the loan for his Cadillac. There was testimony that as of January 8, 2008, [Graggs] was working full time and making $ 16.26 per hour, and he netted $ 443.73 on January 4, 2008 and $ 495.76 on January 11, 2008. Additionally, prior to making the lump-sum payment on the vehicle, [Graggs] had made only erratic payments during 2007.

During an interview with Whitehall Detective Steve Brown, [Graggs] told Detective Brown that while he knew Brock, he had not seen him in ten years. [Graggs] also told Detective Brown that he was unfamiliar with the apartments where Brock was killed and had never been there. [Graggs] denied even knowing where the apartments were located. According to phone records, [Graggs] made three calls between 7:42 and 7:43 p.m. on January 8, 2008 in the vicinity of a cell tower one-half mile from Marcus's apartment. At approximately 8:50 p.m. that same day, [Graggs] made two calls in the vicinity of a cell tower near his home. None of the calls appeared to have been made to Marcus, Dominic or Lanier.

On February 15, 2008, [Graggs] was indicted for one count of aggravated robbery, one count of kidnapping, one count of murder, and two counts of aggravated murder, all with firearm specifications. A jury trial began on January 13, 2009. After the state presented its case, it dismissed the murder charge. On January 22, 2009, the jury found [Graggs] guilty of all the remaining counts, but not guilty of the firearm specifications. On February 5, 2009, [Graggs] filed a motion for a new trial pursuant to Crim.R. 33, and said motion was denied on February 23, 2009. A sentencing hearing was held on February 26, 2009, and an aggregate sentence of life imprisonment without parole was imposed.

(Footnote omitted.) *State v. Graggs*, 10th Dist. No. 09AP-339, 2009-Ohio-5975, ¶ 2-12 ("*Graggs I*").

{¶ 4}  Two days before his conviction was affirmed in *Graggs I*, Graggs filed a petition for postconviction relief.  (Nov. 10, 2009 Postconviction Petition.)  In a decision affirming the denial of this petition without a hearing, we summarized the additional evidence Graggs attached to the petition:

> [Graggs] submitted with his petition several unauthenticated documents purportedly establishing his cell phone usage on the night of Brock's murder. [Graggs] contends that submission of this additional evidence, by stipulation or live testimony, would have established that he could not have been at the scene of Brock's murder. However, other evidence submitted at trial belies [Graggs]' assertion. As noted above, a piece of torn latex glove containing [Graggs]' DNA was found beneath Brock's body despite [Graggs] telling police that he had never been to Jones' apartment. Thus, even assuming that trial counsel should have submitted the additional cell phone evidence, the failure to do so was not prejudicial to [Graggs].
>
> [Graggs] submitted with his petition an affidavit from his wife, Kim Graggs[], purportedly establishing that defense counsel failed to timely secure from her an affidavit in support of his claim of juror misconduct. We first note that the affidavit is not properly notarized. Moreover, even if the affidavit were properly notarized, it is still deficient to establish a claim of juror misconduct. [Kim] Graggs states that she overheard a conversation between four jurors during lunch break on January 22, 2009, the day the verdicts were rendered. However, she fails to affirmatively state that these jurors were seated in [Graggs]' case, fails to specify where she heard the alleged conversation, and fails to disclose the substance of the conversation. The failure to provide specific information in the affidavit is fatal to [Graggs]' claim of juror misconduct. [Graggs] cannot establish that defense counsel was ineffective in failing to attach Kim Graggs' affidavit to his new trial motion when that affidavit is devoid of specific facts that would support his claim of juror misconduct.
>
> [Graggs] submitted with his petition an affidavit from [Tierra] Davis stating what her testimony would have been had she been called to testify. Initially, we note that the affidavit is not properly notarized. Moreover, even if the affidavit were properly notarized, it is still deficient to establish that defense counsel was ineffective in failing to call Davis to testify. In her affidavit, Davis states that in late 2007, [Graggs] purchased a 2000 Harley Davidson motorcycle from her for the sum of $ 6,500. She further avers that [Graggs] made a $ 2,000 payment

> on November 16, 2007, a $ 2,000 payment on December 2, 2007, and a $ 2,500 payment on December 29, 2007. Davis further states that on January 3, 2008, she refunded the $ 6,500 to [Graggs] because she could not find the title to the motorcycle. [Graggs] asserts that Davis' testimony could have explained how he was able to purchase expensive jewelry and make a large payment on his automobile loan shortly after Brock's murder.

*State v. Graggs*, 10th Dist. No. 10AP-249, 2010-Ohio-5716, ¶ 27-29 ("*Graggs II*").

{¶ 5} Nearly three years later, Graggs filed a motion for leave to file a motion requesting a new trial based on newly discovered evidence. (Aug. 8, 2013 Mot. for Leave to File Mot. for New Trial.) In affirming the trial court's denial of the motion, we once again recounted the additional evidence Graggs had developed in support of his claim of innocence:

> In support of his motion, [Graggs] provided three affidavits. Ugbe Ojile ("Ojile"), the law library clerk at the Orient Correctional Center, attested that, in July of 2013, he overheard Kelvin Bridges ("Bridges") state that he had gone to Lanier's apartment to purchase drugs one evening. Ojile attested that Bridges indicated Brock was in the apartment at the time and that, the following day, Bridges learned on the news that Brock had been killed. [Graggs] also filed an affidavit, attesting that, in July 2013, Ojile asked him if he knew Bridges. [Graggs] stated that he did not know Bridges and that Ojile stated that he heard Bridges involved in a conversation related to Brock's death. [Graggs] further stated that he met with Bridges and heard his statement, then asked Bridges to provide an affidavit attesting to that statement. [Graggs] also provided an affidavit from Bridges. In the affidavit, Bridges stated that, on the evening of January 8, 2008, he was at Lanier's apartment between 8:55 and 9:07 p.m. Bridges attested that Brock escorted him into the apartment and then laid down on the sofa to watch television while Bridges purchased cocaine from Lanier. Bridges stated that, during the transaction, Lanier weighed two of the packages of cocaine he planned to sell to Bridges and discovered that they each contained three grams less than an ounce. Bridges attested that Lanier asked Brock if he had been in the packages of cocaine. In his motion, [Graggs] suggested that the information provided by Bridges demonstrated a motive for Lanier to kill Brock and would establish that [Graggs] could not have committed the murder.

*State v. Graggs*, 10th Dist. No. 13AP-852, 2014-Ohio-1195, ¶ 3 ("*Graggs III*").

{¶ 6} One year after the decision issued in *Graggs III*, Graggs filed a motion for a new trial accompanied by a motion for leave to file. (Mar. 24, 2015 Mot. for Leave; Mar. 24, 2015 Mot. for New Trial.) In affirming the trial court's denial of this latest motion, we again described a number of items of new evidence Graggs had developed and explained why, despite pointing to the possibility of Lanier having been the shooter, the new evidence did not tend to exonerate Graggs from having been an aider and abettor:

> In the present case, [Graggs]' motion for new trial was based upon the affidavit of [a fellow inmate, Jamal] Sealy. In the affidavit, Sealy claimed that Lanier had asked him in June 2008 to store large amounts of cocaine and money at his house. When Sealy told Lanier that he did not want to end up dead like Brock, Lanier told him that he did not need to worry because he was the person who killed Brock. Lanier told him that Brock had been stealing drugs from him, and he only meant to scare Brock, but his gun accidentally fired. Lanier told Sealy that he got scared and tried to shoot Brock again, but his gun jammed, so he used another gun to shoot Brock two more times. Sealy averred that he did not know that [Graggs] had been convicted of the murder until October 2014, when he read an article in an April 1, 2014 Columbus Daily Reporter newspaper. Sealy claimed he wrote to the Franklin County Prosecutor's Office sometime in late November 2014 to give them the information, but he never received a reply. In December 2014, Sealy conducted some research and discovered that Graggs was in the same prison as he was, so he met with Graggs and told him what Lanier had said.
>
> The trial court here addressed both the merits of [Graggs]' motion for leave to file his motion for new trial and also the underlying merits of the argument in favor of a new trial, which this court found in *Graggs III* to be permissible. *See id.* at ¶ 9. With regard to [Graggs]' motion for leave to file a motion for new trial, the trial court concluded that Lanier's involvement in drug dealing from the apartment in which Brock was murdered had been obvious from the beginning, and the factual record from the trial and all of [Graggs]' appeals set out Lanier's involvement. The trial court found that, although it was unclear whether [Graggs]' counsel interviewed Lanier prior to trial and before he was murdered, the State of Ohio, plaintiff-appellee, identified Lanier during discovery in May 2008, and [Graggs] had every opportunity to develop Lanier's role. With regard to the merits of the underlying motion for new trial, the trial court found that Sealy's affidavit did not convey a strong probability of changing the result at trial, even if a new trial were granted.

The trial court determined that Lanier's alleged confession to Sealy was hearsay, and it was unlikely Sealy would be permitted to testify regarding such statement. The trial court also found that Sealy's statement does not dispel the possibility that [Graggs] was still involved in Brock's murder as an aider and abettor, as the jury apparently believed because it acquitted him of the firearm specifications.

However, even if we were to find, assuming arguendo, that [Graggs] was unavoidably prevented from discovering the new evidence about Lanier earlier, as [Graggs] argues in his first assignment of error, [Graggs]' motion would fail because the new evidence does not disclose a strong probability that it would change the result if a new trial were granted. Initially, Sealy has no evidence to offer on Lanier's alleged involvement in Brock's murder outside of his own testimony. That Sealy's testimony, which is unrebuttable by the now deceased Lanier, would convince a jury of Lanier's sole involvement in the crime is highly unlikely. Sealy's testimony does nothing to exonerate [Graggs] as an aider and abettor, which the jury apparently believed [Graggs] to be. Both Sealy's averments and [Graggs]' arguments in his brief completely ignore the incriminatory evidence produced at trial that convincingly demonstrated [Graggs] was involved in Brock's murder. As we explained in *Graggs I*, [Graggs] told detectives during questioning that he had never been to the apartment complex in question and had not seen Brock for ten years, *id.* at ¶ 25; however, the DNA on the tip of a latex glove found near Brock's body matched [Graggs]' DNA. *Id.* at ¶ 18. The glove tip from the scene was also determined to be similar to the glove found at [Graggs]' residence. *Id.* at ¶ 9. Furthermore, phone records established that calls from [Graggs]' cell phone were made in the vicinity of Jones's apartment around the time of the shooting. *Id.* According to phone records, [Graggs] made three calls between 7:42 and 7:43 p.m. on the night of the murder in the vicinity of a cell tower one-half mile from Jones's apartment. *Id.* at ¶ 11. At approximately 8:50 p.m. that same day, [Graggs] made two calls in the vicinity of a cell tower near his home. *Id.*

Additionally, Jones testified that $35,000 in cash was missing from the apartment after Brock's murder. *Id.* at ¶ 25. On the day after the murder, [Graggs] paid $480.35 in cash for a pair of diamond earrings at a jewelry store. *Id.* at ¶ 10. He returned to the same jewelry store the same day and paid $4,771.69 in cash for an anniversary ring. *Id.* Six days after the murder, [Graggs] made a lump-sum payment of $2,900 on the loan for his Cadillac. As we explained in Graggs I, there was testimony

> that, as of January 8, 2008, [Graggs] was working full-time and making $16.26 per hour netting $443.73 on January 4 and $495.76 on January 11, 2008, and [Graggs] had made only erratic payments on his car loan during 2007.
>
> Therefore, even if we were to assume arguendo that [Graggs] was unavoidably prevented from discovering Sealy's information within the time prescribed for filing a motion for new trial through the exercise of reasonable diligence, we agree with the trial court that [Graggs]' motion would fail because Sealy's affidavit does not disclose a strong probability that it would change the result if a new trial was granted. Sealy's affidavit does nothing to prevent a conclusion that [Graggs] was an aider and abettor, as the jury found, and fails to rebut any of the evidence this court relied on in *Graggs I* in finding the trial court's judgment was not based on insufficient evidence nor against the manifest weight of the evidence.

*State v. Graggs*, 10th Dist. No. 15AP-480, 2015-Ohio-3990, ¶ 11-15 ("*Graggs IV*").

{¶ 7}   The next year, on July 14, 2016, Graggs filed a combined motion for a new trial and motion for leave to file.[1]  (July 14, 2016 Mot. for Leave to File Mot. for New Trial.) Once again affirming the trial court's denial of a new trial motion, we discussed the evidence presented:

> In support of his motion, [Graggs] attached an affidavit from Michael Shepard, who claimed to have been in the apartment at the time Brock was shot. Shepard stated that he, Lanier, and Brock were the only ones in the apartment, and that Brock had been shot while [Shepard] was in the bathroom. (July 14, 2016 Mot. & Shepard Aff.) Graggs also attached an affidavit signed by Lance King, who stated that he had heard Shepard state "during a conversation with four or five other guys" that Shepard had been present when Lanier shot Brock. (King Aff.)

*State v. Graggs*, 10th Dist. No. 16AP-611, 2017-Ohio-4454, ¶ 8 ("*Graggs V*").  In *Graggs V*, we also explained the reasons that the testimony of Shepard would not have changed the outcome in Graggs' case:

> As the trial court noted, both the affidavit of Shepard and the affidavit that formed the basis for the Crim.R. 33 motion that was the subject of *Graggs III* only implicate Lanier as a shooter, but this is not inconsistent with the case made against

---

[1] Graggs also filed, on August 2, 2016, another motion for a new trial without requesting leave to do so or attempting to make the showings necessary for a delayed motion.  (Aug. 2, 2016 Mot. for New Trial.)  The trial court denied it on that basis, and Graggs did not appeal.  (Aug. 4, 2016 Entry.)

> Graggs. Brock had been shot multiple times from more than one weapon, suggesting the presence of more than one shooter. Furthermore, the state introduced strong evidence against Graggs, including evidence of his DNA on the glove under the victim's body, a piece from a similar glove recovered from Graggs' apartment, the large cash transactions the day after the murder, and the cell phone records placing Graggs in the vicinity of the apartment the night of the murder. Thus, even if the evidence that Graggs relies upon were to be admitted at a new trial, it is unlikely to change the result from the first one. The trial court did not err when it came to the same conclusion.

*Graggs V* at ¶ 19.

{¶ 8} Less than one year following *Graggs V*, Graggs filed another postconviction petition. (Jan. 22, 2018 Postconviction Petition.) To support the petition, Graggs submitted a number of affidavits, some that had previously been submitted and some that were new.

{¶ 9} The first exhibit was the 2013 affidavit of Kelvin Bridges. Bridges averred that he bought drugs from Lanier in his apartment at approximately 9 p.m. and that during the transaction Lanier asked Brock if he had stolen some drugs out of the packages. (July 15, 2013 Bridges Aff., Ex. A to Jan. 22, 2018 Postconviction Petition.)

{¶ 10} The next exhibit was the 2016 affidavit of Michael Shepard. (June 8, 2016 Shepard Aff., Ex. B to Jan. 22, 2018 Postconviction Petition.) He averred that he had taken some of the drugs out of the baggies kept by Lanier. *Id.* at 2. When Lanier discovered drugs were missing, Lanier accused Brock of stealing drugs and then shot him. *Id.* Shepard recounted that, after hearing the argument over the missing drugs and the shots, he took a step out of the bathroom and saw Lanier, with his back to the bathroom, gun in hand and another gun lying at his feet, standing over Brock's body. *Id.* Shepard swore that he fled the apartment, was arrested shortly after for an unrelated crime, and did not learn until 2016 that Graggs was incarcerated for the murder of Brock. *Id.* at 3. Graggs also attached the 2016 affidavit of Lance King recounting how King made the introduction between Graggs and Shepard after hearing Shepard gossiping about how Lanier had killed Brock. (June 14, 2016 King Aff., Ex. D to Jan. 22, 2018 Postconviction Petition.)

{¶ 11} Though the Bridges, Shepard, and King affidavits had been submitted in support of previous petitions and motions, the remaining fact witness affidavit, by Albert Mullins, was new. (Aug. 25, 2017 Mullins Aff., Ex. C to Jan. 22, 2018 Postconviction

Petition.)   Mullins averred that he and some of his acquaintances helped Graggs paint apartments and detail cars as a way to earn extra money.  *Id.* at ¶ 7-11.  He stated that on these occasions, they all wore latex gloves. *Id.*  Rather than throwing the gloves away when the work was done, Mullins recounted he often collected them and then reused them for use in cutting marijuana and cooking crack cocaine in the apartment where Brock was murdered.  *Id.* at ¶ 1-2, 4-6, 12.  Mullins also said the fingers of these gloves were sometimes cut off and reused as packaging for drugs.  *Id.* at 6.  In short, Mullins concluded that, on an unknown number of occasions, he took used latex gloves from Graggs into the apartment where Brock was murdered to be reused in the drug trade.  *Id.* at 13.  He additionally stated that he absconded to Tennessee in 2009 to avoid a warrant and did not learn that the gloves were of possible import to Graggs' case until 2017, when Graggs happened to mention that his DNA was found in the fingertip of a glove.  *Id.* at ¶ 17, 19-23.

{¶ 12}  Graggs also submitted his own affidavit to the effect that he had not known before 2017 that Mullins (with whom he regularly washed cars at a local car wash) was taking the used gloves to be reused in the drug trade at the apartment down the street where Brock was murdered.  (Dec. 13, 2017 Graggs Aff. at 1-2, Ex. E to Jan. 22, 2018 Postconviction Petition.)   But Graggs maintained that he had told his trial counsel that Mullins had worked with him at a car wash near the murder scene and that they had used latex gloves there.  *Id.* at 1.  Although he did not know that Mullins was connected with the apartment in which the murder took place, Graggs suggested to his trial counsel that someone could have "tracked" a piece of a glove he used into the apartment from the car wash.  *Id.*  Graggs averred that his trial counsel expressed skepticism about that notion, and declined to follow up.  *Id.*

{¶ 13} The final significant body of material Graggs submitted to support his petition consisted of cellular tower maps and a map of the location where he washed cars, along with authenticating affidavits and other materials, together tending to show that the 120-degree coverage arc of the cell tower that recorded his phone's location near the time of the murder encompassed both the murder scene and the car wash.  *Compare* Oct. 25, 2017 K. Graggs Aff. & Map at 2, Ex. F to Jan. 22, 2018 Postconviction Petition *with* Nov. 28, 2017 Graggs Aff. & Cell Report at 3, Ex. I to Jan. 22, 2018 Postconviction Petition.

{¶ 14} The trial court denied the untimely successive postconviction petition without a hearing.  (Apr. 11, 2018 Entry.)  It reasoned that Graggs had not introduced anything new of note and therefore failed to show that he was unavoidably prevented from discovery of the facts on which his petition relied.  *Id.* in passim.  It also reasoned that the notion that someone "might have taken used latex gloves in to the apartment – even a glove containing Graggs' DNA – is not necessarily exculpatory."  *Id.* at 3.  Graggs appealed and this Court reversed.  *State v. Graggs*, 10th Dist. No. 18AP-491, 2019-Ohio-361 ("*Graggs VI*").

{¶ 15} In reversing, we reasoned that the previously submitted materials (such as the affidavits of Bridges, Shepard, King, and the cellular records) were previously discovered and thus could not have provided a basis for a finding that Graggs was unavoidably prevented from presenting them on an earlier occasion.  *Graggs VI* at ¶ 20.  However, the Mullins affidavit was new and provided an explanation of how Mullins had absconded out of state, thereby preventing Graggs from discovering the information that could explain how the key piece of evidence (a portion of a latex glove with Graggs' DNA) ended up inside the apartment where the murder took place.  *Id.* at ¶ 26-28.  The importance of the glove was something we emphasized.  *Graggs VI* at ¶ 29-31.  We noted, for example, that Mullins' affidavit, "if believed, cast doubt on the one piece of physical evidence submitted by the state that places appellant inside the apartment where the crimes took place and contradicts appellant's statement to police that he had never been in the apartment where Brock was killed."  *Id.* at ¶ 30.  We also elaborated, "[i]n the absence of DNA evidence found on the latex glove, there was no physical evidence to support a finding that appellant had ever been in that apartment. Under the state's theory of guilt, appellant could not have been convicted either as a principal offender or as an aider and abettor to murder, aggravated burglary, and kidnapping if he was not in the apartment with Brock at the time the crimes were committed."  *Id.* at ¶ 31.  Ultimately, we explained our decision to reverse by stating, "[b]ecause the trial court did not consider Mullins' affidavit and did not conduct a credibility analysis of the affidavits submitted in support of his petition, the trial

court erred by dismissing the petition, without a hearing."[2]  *Id.* at ¶ 28; *see also id.* at ¶ 35-36.

{¶ 16}  Approximately one month after the reversal, the trial court again denied Graggs' postconviction petition without a hearing.  (Mar. 8, 2019 Entry.)  It reasoned that our earlier reversal and remand was essentially premised on the fact that it had overlooked the Mullins affidavit when it dismissed the petition the first time.  *Id.* at 2.  It therefore considered Mullins' affidavit.  It noted that Mullins' affidavit suggested he was unwilling to get involved in the case and that a detective testified at trial that he sought and failed to find Mullins.  *Id.* at 3-4.  It therefore concluded that Graggs had not shown that Mullins was available to the defense at the time of the original trial and thus found that Graggs had not shown ineffective assistance on the part of his counsel in failing to call Mullins as a witness.  *Id.* at 3-5.  Yet, the trial court also found that Graggs had not been unavoidably prevented from discovering the content of Mullins' testimony under R.C. 2953.23(A)(1)(a).[3]  (Mar. 8, 2019 Entry at 8.)  It finally questioned the value (but not the credibility) of Mullins' alternative explanation for how Graggs' DNA came to be at the murder scene, explicitly repeating a finding which we previously quoted and repudiated, "[t]he mere fact that others used the Whitehall apartment for drug storage and trafficking and might have taken used latex gloves in – even a used glove containing Graggs' DNA – is not necessarily exculpatory."  *Id.* at 9; *cf.* Apr. 11, 2018 Entry at 3; *Graggs VI* at ¶ 29-31.

{¶ 17}  Graggs now appeals again.

## II. ASSIGNMENT OF ERROR

{¶ 18}  Graggs, proceeding pro se, articulates a single assignment of error for our review:

> The trial court abused its discretion when it went beyond the scope of remand which required it to conduct a credibility analysis on Mullins['] affidavit, and instead adjudicated other issues that the appellate court had already decided.

---

[2] We also noted that the trial court's contention that the petition was barred by res judicata was meritless. *Graggs VI* at ¶ 36, fn. 7.

[3] The trial court's decision, presumably as a result of clerical error, repeatedly references R.C. 2953.23(A)(2,) rather than division (A)(1).  (Mar. 8, 2019 Entry at 5, 8-9.)  Division (A)(2) of R.C. 2953.23 concerns DNA testing and is not relevant to this appeal.

## III. DISCUSSION

{¶ 19} The postconviction relief process is a collateral civil attack on a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994). "It is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained" in the trial court record. *State v. Murphy*, 10th Dist. No. 00AP-233, 2000 WL 1877526, 2000 Ohio App. LEXIS 6129, *5 (Dec. 26, 2000); *see also, e.g.*, *State v. Carter*, 10th Dist. No. 13AP-4, 2013-Ohio-4058, ¶ 15. As relevant to this case, Graggs' petition for postconviction relief was required to establish "that there was such a denial or infringement of [his] rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." R.C. 2953.21(A)(1)(a). Because Graggs' current petition was not the first petition for postconviction relief filed, he was also required to demonstrate that he "was unavoidably prevented from discovery of the facts upon which [he] must rely to present the claim for relief" and that "but for constitutional error at trial, no reasonable factfinder would have found [him] guilty of the offense of which the petitioner was convicted." R.C. 2953.23(A)(1)(a) and (b).

{¶ 20} A defendant is not automatically entitled to an evidentiary hearing on a postconviction relief petition. *State v. Jackson*, 64 Ohio St.2d 107, 110 (1980). R.C. 2953.21(D) provides that "[b]efore granting a hearing on a petition * * *, the court shall determine whether there are substantive grounds for relief." Thus, the petitioner bears the initial burden of providing evidence that demonstrates a cognizable claim of constitutional error. *State v. Ibrahim*, 10th Dist. No. 14AP-355, 2014-Ohio-5307, ¶ 9. Because the burden is the petitioner's, a postconviction relief petition may be denied without an evidentiary hearing where the petition and supporting materials do not demonstrate that the petitioner set forth sufficient operative facts to establish substantive grounds for relief. *State v. Calhoun*, 86 Ohio St.3d 279, 282-83 (1999).

{¶ 21} Review of this question is mixed. *State v. Barber*, 10th Dist. No. 16AP-172, 2017-Ohio-9257, ¶ 17, 20; *cf. State v. Kane*, 10th Dist. No. 16AP-781, 2017-Ohio-7838, ¶ 9. We have recognized that "in reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact." *State*

*v. Canada*, 10th Dist. No. 16AP-7, 2016-Ohio-5948, ¶ 17; *see also Calhoun*, 86 Ohio St.3d at 285 (noting five factors that should be considered before a trial court may exercise its discretion to decline to accept an affidavit as true); *accord State v. Taylor*, 10th Dist. No. 14AP-166, 2014-Ohio-3574, ¶ 23; *Ibrahim*, 2014-Ohio-5307, at ¶ 24. We therefore review the factual findings of the trial court for compliance with the *Calhoun* analysis and also for whether the trial court abused the "sound exercise of discretion" permitted by *Calhoun*. *Calhoun*, 86 Ohio St.3d at 284; *State v. Campbell*, 10th Dist. No. 03AP-147, 2003-Ohio-6305, ¶ 14. However, we review questions of law de novo. *Barber*, 2017-Ohio-9257, at ¶ 20; *Kane*, 2017-Ohio-7838, at ¶ 9.

{¶ 22} Rather than address the credibility of Mullins' affidavit under *Calhoun* as contemplated by our remand in *Graggs VI* at ¶ 28, 35-36, the trial court ignored the credibility issue and instead articulated four findings in order to again justify denying Graggs' petition without a hearing. First, it found that Graggs' petition was based entirely on a claim for ineffective assistance of trial counsel. (Mar. 8, 2019 Entry at 3.) Second, it found that, even assuming Mullins' and Graggs' affidavits to be credible, Graggs' attorney had not committed ineffective assistance because there was no evidence that he could have discovered or learned of and presented in Mullins' testimony at trial. *Id.* at 3-5. Third, the trial court found Graggs had not been unavoidably prevented from discovering the content of Mullins' testimony under R.C. 2953.23(A)(1)(a). (Mar. 8, 2019 Entry at 8.) Finally, the trial court questioned the value of Mullins' testimony to exculpate Graggs, repeating verbatim its prior finding that we had repudiated in *Graggs IV* that Mullins explanation was "not necessarily exculpatory for Graggs." *Id.* at 9.

{¶ 23} In regard to this last finding of the trial court, we note that our decision in *Graggs VI* was quite clear that Mullins' testimony, if believed, would certainly have had an effect on the viability of the State's original case against Graggs:

> The trial court further concluded, pursuant to R.C. 2953.23(A)(1)(b), that "there is not clear and convincing evidence that, but for constitutional error at trial, [appellant] would have avoided criminal liability." (Apr. 11, 2018 Journal Entry at 3.) In reaching this conclusion, the trial court reasoned as follows:
>
>> The[] mere fact that others using the Whitehall apartment for drug storage and trafficking might have taken used latex gloves in to the apartment

— even a glove containing [appellant's] DNA — is not necessarily exculpatory for [appellant]. He too might have gone there, or so any jury might reasonably conclude when a piece of a latex glove was found near the body after the murder, and other evidence independently pointed toward [appellant]. Thus, the second requirement of R.C. 2953.23(A)(1)(b) has also not been met.

(Emphasis added.) (Apr. 11, 2018 Journal Entry at 3.)

The trial court reached its conclusion under R.C. 2953.23(A)(1)(b) without the benefit of reviewing Mullins' affidavit. Our review of Mullins' affidavit leads us to the conclusion that the facts contained therein, if believed, cast doubt on the one piece of physical evidence submitted by the state that places [Graggs] inside the apartment where the crimes took place and contradicts [Graggs]' statement to police that he had never been in the apartment where Brock was killed. Though the cell phone records "established that calls from [Graggs]' cell phone were made in the vicinity of Marcus's apartment near the time of the shooting," absent the DNA evidence, the phone records alone do not prove [Graggs] was in the apartment at the time the crimes were committed. *Graggs I*, 2009-Ohio-5975, at ¶ 25. Similarly, while [Graggs]' spending spree the day after the crimes provides circumstantial evidence [Graggs] may have come into possession of the $35,000 in cash stolen from the apartment where the crimes took place, the theory of guilt the state presented to the jury was based exclusively on [Graggs]' presence in the apartment at the time Brock was shot.[Fn. 6]

[Fn. 6] In closing argument, the prosecutor told the jury the following:

There's no other reasonable explanation for [Graggs'] DNA being in a rubber glove at the scene of a murder other than the fact that he was wearing that glove and somehow that glove got broke apart and got ripped off when taking it off and left a piece of it there. Bad for him.

No other reasonable explanation as to his DNA being in a rubber glove found at the scene of a

> homicide, and, again, ladies and gentlemen, in an apartment, by his own words, he's never been in in his life.

(Jan. 16, 2009 Tr. Vol. V at 771-72.)

> In our view, it is one thing for [*Graggs*] to aver that Mullins *might* have transferred a glove containing [Graggs]' DNA to the apartment where the crimes took place but it is quite another for *Mullins* to aver that *he did, in fact*, physically transfer latex gloves containing [Graggs]' DNA to the crime scene where a latex glove containing [Graggs]' DNA was later found by police under Brock's lifeless body. Mullins' testimony provides an explanation of how [Graggs]' DNA could be found on the tip of a latex glove near Brock's body without [Graggs] ever being present in the apartment where the crimes took place. In the absence of DNA evidence found on the latex glove, there was no physical evidence to support a finding that [Graggs] had ever been in that apartment. Under the state's theory of guilt, [Graggs] could not have been convicted either as a principal offender or as an aider and abettor to murder, aggravated burglary, and kidnapping if he was not in the apartment with Brock at the time the crimes were committed.

*Graggs VI* at ¶ 29-31. It was for this reason that we remanded so that the trial court could engage in a proper credibility analysis and determine the necessity of a hearing. *Id.* at ¶ 35-36.

{¶ 24} It is axiomatic that a trial court may not contradict or ignore a mandate of a reviewing court:

> Although the law-of-the-case doctrine generally is "a rule of practice rather than a binding rule of substantive law," [*Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984)], we have also explained that "the Ohio Constitution 'does not grant to a court of common pleas jurisdiction to review a prior mandate of a court of appeals.'" *State ex rel. Cordray v. Marshall*, 123 Ohio St.3d 229, 2009-Ohio-4986, 915 N.E.2d 633, ¶ 32, quoting *State ex rel. Potain v. Mathews*, 59 Ohio St.2d 29, 32, 391 N.E.2d 343 (1979). The doctrine therefore "functions to compel trial courts to follow the mandates of reviewing courts," *Nolan* at 3, and "[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case," *id.* at the syllabus.

*Giancola v. Azem*, 153 Ohio St.3d 594, 2018-Ohio-1694, ¶ 15.  In reviving a finding, we explicitly considered and rejected in *Graggs VI*, the trial court erred.  However, because we ultimately determine that there was a separately sufficient basis on which to deny Graggs' petition, we find this error to have been harmless.

{¶ 25} We also find the trial court erred in stating that Graggs' petition was based entirely on ineffective assistance of trial counsel.  (Mar. 8, 2019 Entry at 3.)  Though it is not a model of clarity, Graggs' pro se petition does clearly argue: "**GRAGGS IS ENTITLED TO POSTCONVICTION RELIEF BECAUSE INCARCERATING AN INNOCENT PERSON FOR LIFE VIOLATES HIS EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS**." (Emphasis sic.) (Jan. 22, 2018 Postconviction Petition at 27-29.)  However, the trial court's error here is also ultimately harmless because this argument is not properly asserted by a postconviction petition.

{¶ 26} Ohio's postconviction relief statute requires a petitioner to show that "a denial or infringement of [his] rights" occurred so "as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States."  R.C. 2953.21 (A)(1)(a).  For this reason, some Ohio appellate districts have held that a claim purely asserting innocent incarceration without asserting that a rights violation *caused* the allegedly unjust incarceration cannot succeed.  *State v. Byrd*, 145 Ohio App.3d 318, 330, fn. 39 (1st Dist.2001) (collecting cases).[4]  Hence, though such a claim could be asserted in a motion for a new trial, which only requires proof of "new evidence material to the defense" that "affect[ed] materially his substantial rights," it cannot be asserted in a postconviction petition.  Crim.R. 33(A)(6); *Byrd*, 145 Ohio App.3d at 331 (noting that " 'actual innocence' claims * * * are more properly raised in a motion for a new trial").  Thus, while we find that the trial court erred in ignoring one of Graggs' claims, the error is harmless because that

---

[4] In federal habeas caselaw, the United States Supreme Court has suggested that imprisonment or execution of an innocent prisoner could violate the U.S. Constitution but has never clarified the standard a prisoner would have to meet to successfully assert such a claim.  *Herrera v. Collins*, 506 U.S. 390, 418-19, 427-29 (1993); *see also id.* at 430-46 (Blackmun, J. dissenting); *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *House v. Bell*, 547 US 518, 554-55 (2006). Still, actual innocence can serve as a defense to otherwise applicable procedural defaults such as successive petitions or petitions that assert claims that could have been asserted previously in the litigation. *McQuiggin* at 392-93.

claim should not have been brought in postconviction and should have instead been brought as a motion for a new trial.[5]  *Byrd* at 331.

{¶ 27} We also observe that the trial court's second and third findings are inconsistent with each other.  That is, the trial court determined that Graggs had not been unavoidably prevented from discovering the content of Mullins' testimony under R.C. 2953.23(A)(1)(a).  (Mar. 8, 2019 Entry at 8.)  This could also be construed as a finding that had the defense exercised "reasonable diligence," Mullins testimony could have been discovered.  *See, e.g.*, *State v. Cashin*, 10th Dist. No. 17AP-338, 2017-Ohio-9289, ¶ 16 ("a defendant cannot demonstrate that he was unavoidably prevented from discovering new evidence when he could have discovered that evidence earlier had he exercised reasonable diligence and effort").  Yet, criminal defense attorneys are constitutionally required to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *State v. Bradley*, 42 Ohio St.3d 136, 146 (1989), quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984).  And the trial court found that Graggs' counsel was not constitutionally deficient—meaning that he fulfilled his duty to reasonably investigate and yet failed to discover and procure Mullins' testimony.  (Mar. 8, 2019 Entry at 3-5.)  In short, on the one hand, the trial court found that Graggs' counsel was diligent but that he did not, in fact, produce Mullins' testimony; while on the other hand, the trial court found in the same decision that had the defense been reasonably diligent, Mullins'

---

[5] While we do not comment on the credibility of the affidavits and evidence Graggs has collected, we note that, if believed, Graggs' submissions would both counter the principle evidence of guilt in his case and supply an alternative narrative for how the crime was committed.  Graggs' sole tie to the apartment where the murder occurred was his DNA in the glove finger recovered in the apartment.  *Graggs VI* at ¶ 30-31.  But Mullins' affidavit explains that Mullins was in the habit of collecting used gloves from Graggs when they washed cars and painted apartments together and in reusing them in the drug trade that occurred at the murder scene. (Aug. 25, 2017 Mullins Aff. at ¶ 1-13.)  Graggs' cell phone was shown to have pinged a tower near the murder scene. *Graggs I* at ¶ 11.  But Kim Graggs' affidavit, in conjunction with a map and the original trial evidence, shows that the garage where Graggs washed cars was within the same 120-degree coverage arc of the nearest cell phone tower as that of the murder scene. *Compare* Oct. 25, 2017 K. Graggs Aff. & Map at 2 *with* Nov. 28, 2017 Graggs Aff. & Cell Report at 3.  Graggs' spending abruptly increased after the robbery/murder. *Graggs I* at ¶ 10.  But Tierra Davis states that she issued Graggs a refund of $6,500 in payments he had made on a motorcycle around the same time as the robbery. *Graggs II* at ¶ 29.  The affidavits of Bridges, Sealy, and Shepard provide an alternative narrative—that Jessie Lanier suspected Fred Brock of stealing drugs and killed him in an argument over that subject.  (June 8, 2016 Shepard Aff.; Mar. 17, 2015 Sealy Aff., filed March 24, 2015; July 15, 2013 Bridges Aff.)  Shepard, in fact, avers that he saw Lanier standing over Brock's body, gun in hand and Sealy avers that Lanier confessed to killing Brock before his death.  (June 8, 2016 Shepard Aff. at 2; Mar. 17, 2015 Sealy Aff. at 1-2.)  The United States Supreme Court has permitted a petition to go forward in similar circumstances. *House*, 547 U.S. at 553-54.

testimony could have been discovered.  Those findings are untenable as part of the same case.

{¶ 28}  We agree with the trial court's finding that Graggs' counsel was not constitutionally deficient.  Mullins' affidavit relates that he absconded to Tennessee in 2009 to dodge a warrant.  (Aug. 25, 2017 Mullins Aff. at ¶ 17.)  In addition, during trial, the Whitehall Police detective who investigated the case testified that he became aware of the existence of Mullins but never found him, never spoke to him, and, as of the date of trial, had no idea where he was.  (Tr. at 615.)[6]  Although Graggs submitted evidence that his counsel declined to argue that someone had "tracked" a piece of a rubber glove from the car wash one-half mile away to the murder scene, Graggs did not submit evidence suggesting that his counsel failed to investigate or failed to obtain Mullins' testimony when it was available to be obtained.  (Dec. 13, 2017 Graggs Aff. at 1.)  Accordingly, we agree with the trial court that Graggs' counsel's failure to discover Mullins' testimony was not indicative of deficient representation within the meaning of *Strickland*.

{¶ 29}  However, because Graggs' counsel was not ineffective, we cannot agree with the trial court's finding that Graggs was not unavoidably prevented from discovering Mullins' testimony.  Mullins' affidavit and the testimony of the investigating detective make clear that soon after the murder, Mullins engaged in a deliberate and apparently successful effort to evade detection with the result that after the month of the murder, he did not encounter Graggs or anyone else connected with the case again until 2017.  (Aug. 25, 2017 Mullins Aff. at ¶ 17-23; Tr. at 615.)  Consequently, we find Graggs was unavoidably prevented from discovering Mullins' testimony, and we disagree with the trial court's finding in that respect.

{¶ 30}  For the reasons expressed above, we sustain in part and overrule in part Graggs' assignment of error but also find that insofar as the assignment of error is sustained, the errors do not require reversal.

## IV.  CONCLUSION

{¶ 31} The trial court erred in holding that Graggs had not shown he was unavoidably prevented from discovering the new evidence that he offered in support of his postconviction petition and in asserting (in direct contradiction of our decision in *Graggs*

---

[6] Filed in five consecutively paginated volumes on May 13, 2009.

*VI*) that Graggs' evidence, even if believed, would not be exculpatory. The trial court also should have addressed the existence, in addition to the ineffective assistance of counsel claim, of Graggs' assertion that his imprisonment is unconstitutional because he is innocent. But these problems ultimately do not require reversal. Graggs should have asserted his innocence claim in a motion for a new trial, not as a postconviction petition. The trial court properly found that Graggs failed to show ineffective assistance of counsel inasmuch as he did not show that the evidence he now asserts could have been (but unjustifiably was not) used by his counsel in the original case.

{¶ 32} Because the innocence claim, made in a postconviction petition and not a motion for new trial, was not properly before the court, and because Graggs failed to substantiate his ineffective assistance of counsel claim, we affirm the judgment of the trial court denying Graggs' petition and we do so on the narrower grounds set forth in this decision, sustaining in part and overruling in part Graggs single assignment of error. Based on our analysis in doing so, we affirm the judgment of the trial court but with the legal determination that Graggs sufficiently showed that he was unavoidably prevented from discovering the evidence on which he now seeks to rely in asserting his innocence and that such evidence, if believed, is exculpatory.

*Judgment affirmed on the
grounds expressed herein.*

SADLER, J., concurring in part and concurring in judgment.
DORRIAN, J., concurring in judgment only.

SADLER, J., concurring in part and concurring in judgment.

{¶ 33} I agree the trial court did not err when it ruled that Graggs' affidavits failed to support his ineffective assistance claim as the record shows that Mullins' testimony could not have been obtained by his trial counsel in the exercise of reasonable diligence. Accordingly, I concur in the judgment of the lead opinion. I write separately because I disagree with the lead opinion's decision to supplant the trial court's finding that Graggs was not unavoidably prevented from discovering Mullins' evidence within the time required to file a timely motion for postconviction relief, and I do not agree that this court should make a contrary finding in this appeal. Additionally, I believe the trial court did comply with this court's remand and would overrule appellant's assignment of error in its entirety.

{¶ 34} "The phrase 'unavoidably prevented' in R.C. 2953.23(A)(1)(a) means that a defendant was unaware of those facts and was unable to learn of them through reasonable diligence." *State v. Turner*, 10th Dist. No. 06AP-876, 2007-Ohio-1468, ¶ 11. *See also State v. Ruark*, 10th Dist. No. 15AP-142, 2015-Ohio-3206, ¶ 11; *State v. Noling*, 11th Dist. No. 2007-P-0034, 2008-Ohio-2394, ¶ 38; *State v. McDonald*, 6th Dist. No. E-04-009, 2005-Ohio-798, ¶ 19. "The 'facts' contemplated by R.C. 2953.23(A)(1)(a) are the historical facts of the case, which occurred up to and including the time of conviction." *Turner* at ¶ 11. *See also Ruark* at ¶ 11; *Noling* at ¶ 38. Accordingly, "[t]he affidavit of a witness who is 'known to the defense at trial' does not fall under the exception of R.C. 2953.23(A)(1)(a) as evidence that the defendant was unavoidably prevented from discovering." *Turner* at ¶ 17, quoting *State v. Stanisha*, 10th Dist. No. 03AP-476, 2003-Ohio-6836, ¶ 16. "[I]nformation contained in an affidavit that establishes facts discoverable before trial fails to satisfy R.C. 2953.23(A)(1)(a)." *Turner* at ¶ 17.

{¶ 35} The critical averments in Graggs' most recent affidavit are as follows:

> In August 2017, it was the first time that I saw Albert Mullins since January 2008, before any arrest.
>
> During our third or fourth conversation, I was telling Albert about I had never been in the Whitehall apartment and did not know how a latex glove with my DNA got in to the Whitehall apartment.
>
> This is when Albert told me about how he had always took discarded latex gloves that we had used while working to the apartment to be reused there, it was not only mine that Albert took, but also others latex gloves.
>
> *At no time before August 2017 was I aware of Albert collecting the discarded latex gloves of mine or others and taking the gloves into the Whitehall apartment or any place else.*

(Emphasis added.) *State v. Graggs*, 10th Dist. No. 18AP-491 2019-Ohio-361, ¶ 11 ("*Graggs VI*"), quoting Graggs' Aff. at 1-2, attached as Ex. E to Jan. 22, 2018 Petition.[7]

---

[7] The relevant averment in Mullins' affidavit are as follows:

> 10. Many times I and others would help [] Graggs detail cars, plus two times a week I would help him wash his and his wife's car, [] Graggs always wore la[t]ex gloves.

{¶ 36} In the trial court's April 11, 2018 journal entry denying Graggs' petition for postconviction relief, the trial court stated:

> On one hand, [Graggs] claims that he suggested to his trial counsel in 2009 that "someone could have tracked the fingertip [of the incriminating glove] in to the apartment" but on the other hand asserts "[a]t no time before August 2017 was I aware of Albert collecting the discarded latex gloves of mine or others and taking the gloves into the Whitehall apartment." (Ex. "E" p. 2.) These statements appear contradictory. More importantly, the absence of any statement from Mr. Mullins himself makes the whole discussion frustratingly incomplete. (Apr. 11, 2018 Journal Entry at 2-3.)

(Emphasis omitted.) *Graggs VI* at ¶ 21.

{¶ 37} On review of the trial court's April 11, 2018 journal entry, this court, in *Graggs VI*, concluded the trial court failed to consider Mullins' affidavit and failed to assess the credibility of Graggs' most recent affidavit. *Graggs VI* at ¶ 35-36. On remand, from our decision in *Graggs VI*, the trial court considered Mullins' affidavit and made the following determination regarding the credibility of Graggs' affidavit:

> While Mullins' affidavit says it was only in August 2017 that Mullins told Graggs that he had collected used latex gloves when they worked together (Mullins' Affidavit, ¶ 22) from the beginning of the police investigation green latex gloves were an important focus. Graggs worked at a paint company at the time. He remembers that he "went through 15 to 20 pair each day" (Graggs' Affidavit, Ex. "E" page 1) and that he also regularly wore latex gloves to wash cars, or at other work like painting projects. (*Id.*) *Since Albert Mullins helped John Graggs with painting projects at which "Graggs handed out and wore latex gloves" and wore gloves while detailing cars, it is far-fetched to suggest that Graggs never learned before 2017 that "[a]fter we were done doing a job, I [Mullins] would clean up the area, which included *** latex gloves.*" (Mullins Affidavit, ¶ 12) In fact, Graggs now says he "suggested to [defense counsel] Mr. Morgan that someone could have tracked the fingertip in to the

---

* * *

12. After we were done doing a job, I would clean up the area, which included rags, paper towels and latex gloves. I am not sure if [] Graggs noticed me collecting the used latex gloves or even if he cared.

*Graggs VI* at ¶ 22, quoting Mullins Aff., attached as Ex. C to Jan. 22, 2018 Petition.

apartment" Graggs simply elected not to use his own knowledge as a witness at trial.

(Emphasis added.)  (Mar. 8, 2019 Decision at 8.)

{¶ 38}  Thus, in my view, the trial court made a credibility determination regarding a critical averment in Graggs' most recent affidavit and found it wanting.  The trial court simply did not believe Graggs' claim that he was unaware, prior to August 2017, Mullins had taken possession of latex gloves containing his DNA at or about the time of Fred Brock's murder.  There is also no question that Graggs learned, during his criminal trial, that Mullins was part of the illegal drug enterprise conducted at the home where the victim was killed and that Mullins had been in the home on or about the date when the victim died.  During Graggs' criminal trial, Marcus Jones testified as follows:

> Q.  Did you ever know a guy named Albert Mullins?
>
> A.  Yes.
>
> Q.  You knew an Albert Mullins?
>
> A.  Yes.
>
> Q.  How did you know Albert Mullins?
>
> A.  Albert used to stay at the house, too.  He used to guard the house.
>
> Q.  When was the last time you had seen Albert Mullins?
>
> A.  Last year a little bit.
>
> Q.  Well, we know this happened on January the 8th.  When is the last of '08, a year ago, when is the last time before then you had seen Albert Mullins?
>
> A.  The day I seen Freddie, Freddie Brock.
>
> * * *
>
> Q.  You had only known Fred a few days and then he died?
>
> A.  Right.
>
> Q.  So it was during those three days you saw Albert Mullins?
>
> A.  The day I seen Fred Brock is the day I seen Albert.

(Tr. 394-95.)

{¶ 39} As previously noted, the lead opinion affirms the trial court's denial of Graggs' petition for postconviction relief "but with the legal determination that Graggs sufficiently showed that he was unavoidably prevented from discovering the evidence on which he now seeks to rely in asserting his innocence." (Lead Opinion at ¶ 32.) In doing so, the lead opinion disregards the credibility determination made by the trial court and makes a finding that Graggs was unavoidably prevented from discovering the evidence on which he relies in support of his application. On this record, I cannot agree with the lead opinion that we should disregard a credibility determination made by the trial court and make a contrary factual finding on appeal. Given the determination that the trial court did not err in denying the petition on the merits, there is no need for this court to make such a finding in order to affirm the trial court's judgment in this case.[8]

{¶ 40} For the foregoing reasons, I would overrule Graggs' assignment of error and affirm the judgment of the trial court. Because the lead opinion only overrules the assignment of error in part, I concur separately. (Lead Opinion at ¶ 32.)

─────────────────

[8] The lead opinion raises and discusses, sua sponte, a possible new trial motion Graggs may file in the future. Because this appeal concerns the trial court's denial of Graggs' successive motion for postconviction relief, any conclusions regarding a possible new trial motion Graggs may file in the future are premature and advisory.